**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Michael Thomas BARNETT,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James Earsel CRAIGO,
Defendant–Appellant.**

**Nos. 90–50080, 90–50083.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 6, 1990.

Decided June 5, 1991.

Janice Hogan, Asst. Federal Public Defender, San Diego, Cal., for defendant-appellant Barnett.

Gerald E. Utti, Encinitas, Cal., for defendant-appellant Craigo.

Roger W. Haines, Asst. U.S. Atty., San Diego, Cal., for plaintiff-appellee.

Before HUG, CANBY and WIGGINS, Circuit Judges.

CANBY, Circuit Judge:

Michael Barnett and James Craigo appeal the denial of their motion to suppress evidence obtained as a result of a search at an immigration checkpoint, resulting in the seizure of illegal drugs and a firearm. We affirm.

## FACTS

Barnett and Craigo were travelling North on Interstate Highway 15 in a GMC Blazer when they were stopped at the permanent immigration checkpoint in Temecula, California. Temecula is approximately 70 miles inland from the United States—Mexican border. The Border Patrol agent on duty at the time testified that he stopped the vehicle because he noticed that the passenger seat was in a reclining position, and he wanted to see whether it was occupied. He asked Barnett, the driver, to roll down his window, which Barnett did. Craigo was in the reclining seat. The agent asked Barnett where they were coming from and travelling to. Barnett responded that they were travelling to Oklahoma, but he either could not remember or was unable to pronounce their point of departure. He turned for assistance to Craigo. Craigo said, and Barnett repeated to the Agent, "Encinitas," which is in the United States. Some reference was also made to San Diego.

The agent testified that Barnett "was nervous ... was looking around, not at me ..." [Transcript of Motion Hearing, July 17, 1989.] The Agent then attempted to look into the rear interior of the vehicle with his flashlight. He was unable to see clearly because the windows were tinted, but he was able to discern "bags and stuff." [*Id.* at 37.] He then referred the vehicle to a secondary inspection area for the purpose, he testified, "to get a better look into the back of the Jimmy GMC Blazer...." [*Id.* at 30.]

At the secondary inspection area, another agent requested permission to do a perimeter canine search of the vehicle. Barnett consented to that search and to the agent's request that he and Craigo get out of the vehicle to facilitate that search. The agent testified that he had no suspicion of any immigration related offense, but, rather, that "[w]hen I'm in secondary, I use the canine on all vehicles that I am able to at the time while I'm in secondary." [*Id.* at 53.]

The dog "alerted" to two places on the exterior of the vehicle, and the agent asked permission to do a search of the interior by hand. Craigo, the owner of the car, consented to the hand search, as a result of which the contraband was found and Barnett and Craigo were arrested.

## PROCEEDINGS BELOW

At the hearing of the motion to suppress the evidence obtained in the search, Barnett and Craigo did not contest their consent to either the canine perimeter search or to the interior search of their car. They asserted, however, that the first agent's motive for referral to the secondary inspection area was to detect drug-related offenses, and that referral for such a purpose required articulable suspicion of such an offense. They further contended that there was no basis for suspicion of either drug- or immigration-related offenses.

At the suppression hearing, the government attorney appeared to concede that in order for an agent to refer a vehicle stopped at a permanent immigration checkpoint to a secondary inspection area, he or she needs "at least some level of articulated suspicion," [*Id.* at 14. *See also Id.* at 32.] The district court found that the totality of the circumstances did provide articulable suspicion to refer to the secondary inspection area, and, consequently, that Barnett's and Craigo's fourth amendment rights were not violated. The district court particularly singled out the defendants' "edginess" and nervousness at the initial questioning, and also the agent's inability

to see into the rear of the vehicle other than to notice that there were "shapes of packages or boxes or things" [*Id.* at 63–64.] On that basis, the court denied their motion to suppress.

## DISCUSSION

■ Although the parties argue the question whether the first Border Patrol agent had articulable suspicion justifying his referral of Barnett and Craigo to the secondary inspection area we find it unnecessary to resolve that issue. For reasons we will explain, the Supreme Court's decision in *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), requires that we affirm the district court's order because articulable suspicion was not required in these circumstances for such a referral.

Barnett and Craigo contend that we cannot affirm on that ground because the government conceded at the suppression hearing that articulable suspicion was required. It does, indeed, appear that the government made that concession at trial.[1] As a consequence of that concession and its finding that articulable suspicion existed, the district court was not required to rule on the need for articulable suspicion in these circumstances.

■ Normally, we do not consider an issue not passed upon by the district court. That rule, however, is not a jurisdictional dictate but a rule of practice, and may be relaxed where "significant questions of general impact are raised; injustice might otherwise result; plain error has occurred; resolution of the new issue is purely a matter of law and does not rely upon the factual record developed by the parties ..." *People of the Territory of Guam v. Okada,* 694 F.2d 565 (9th Cir.1982) amended at 715 F.2d 1347 (1983), *cert. denied,* 469 U.S. 1021, 105 S.Ct. 441, 83 L.Ed.2d 367

(1984); *accord Singleton v. Wulff,* 428 U.S. 106, 121, 96 S.Ct. 2868, 2877–78, 49 L.Ed.2d 826 (1975).

In this case, the new issue is purely one of law. The government has not made contradictory assertions of fact. Had the government argued (correctly) to the district court that there was no need for articulable suspicion here, Barnett and Craigo would not have offered different or additional evidence that would bear on our resolution of this issue.[2] Further, Barnett and Craigo are not surprised by the emergence of this issue on appeal. They briefed and argued this issue extensively before the district court, whose need to rule on the issue was avoided only by the government's failure to insist that it do so. They are not placed at a disadvantage by our addressing the issue. We proceed, therefore to do so.

The Temecula immigration checkpoint is apparently similar, in every pertinent regard, (including distance to the United States—Mexican border) to the permanent San Clemente checkpoint, described in detail in *United States v. Martinez–Fuerte,* 428 U.S. 543, 545–46, 96 S.Ct. 3074, 3077–78, 49 L.Ed.2d 1116 (1975). In that case, the Supreme Court held that a vehicle could be stopped at "reasonably located checkpoints," *Id.* at 562, 96 S.Ct. at 3085, for brief initial questioning and referred to a secondary inspection area for further brief questioning "in the absence of any individualized suspicion...." *Id.*

Barnett and Craigo do not contend that the Temecula checkpoint, itself, is not "reasonably located" or is defective in any other regard that might affect the applicability of *Martinez–Fuerte* to the facts of this case. Here, the Border Patrol Agent at Temecula stopped the car in which Barnett and Craigo were travelling, and asked a few brief questions and referred the car to

---

1. A generous construction of the government's position at the suppression hearing (urged by the government on appeal) is that it contended that *even if* articulable suspicion were required, such suspicion was present here.

2. Thus, *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), is in ac-

cord. In *Steagald,* the Court held that "[t]he Government, however, may lose its right to raise *factual* issues of this sort before the court when it has made contrary assertions in the courts below ..." *Id.* at 209, 101 S.Ct. at 1646 (emphasis added).

the secondary inspection area. Barnett and Craigo do not contend that this initial stop exceeded, in intrusiveness, the stop and initial inquiry in *Martinez–Fuerte.*

The first thing that happened in the secondary inspection area was the request by another agent for consent to do a canine perimeter search, followed by the request to do a hand search of the interior of the car. Barnett and Craigo do not contest the validity of either of these procedures.

■ Barnett and Craigo do, however, contend that their *referral* by the first agent to secondary inspection was illegal, for lack of articulable suspicion or probable cause. They argue that the first agent's purpose in referring them to secondary inspection was not at all for further investigation as to immigration-related offenses, but, rather, for investigation as to drug-related offenses. They argue that referral for such a purpose requires articulable suspicion. We disagree.

*Martinez–Fuerte* says nothing about the legality of searching for drugs at permanent immigration checkpoints.[3] Its analysis focuses exclusively on immigration-related searches, and expressly announces that "our holding today is limited to the type of stops described in this opinion." *Id.* at 567, 96 S.Ct. at 3087. That limitation, however, does not mandate an inquiry into the subjective purpose of the agent making referrals to secondary inspection, unless there is some objective evidence supporting the charge of pretext. *Horton v. California,* — U.S. ——, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). Aside from specu-

lation about the agent's subjective intent, the stop and referral of Barnett and Craigo was precisely the type of stop described in *Martinez–Fuerte.*

The only evidence offered by Barnett and Craigo that the first agent's purpose was not for immigration-related inquiry is the *lack* of evidence that it was for such an inquiry. The lack of evidence supporting referral to secondary inspection is precisely what *Martinez–Fuerte* authorized. It would set that decision on its head to say that, while agents do not need articulable suspicion to refer for immigration-related inquiry, they must offer articulable suspicion of immigration-related offenses to demonstrate that they are *not* referring for another purpose.

Had Barnett and Craigo offered affirmative evidence that the first agent harbored a subjective purpose to refer to secondary inspection for drug-related offenses, we would be required to address the applicability of the cases that deal with "pretextual" seizures to the type of stop authorized by *Martinez–Fuerte. See Horton, supra; Maryland v. Macon,* 472 U.S. 463, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985). But in the absence of that evidence, we need not reflect upon the applicability of *Martinez–Fuerte* to referrals where it appears that the referral is only (or even partially) for drugs. Barnett and Craigo have offered no evidence why this was not a legitimate immigration stop. The agent at initial inspection offered evidence consistent with an immigration purpose.[4] Thus, *Martinez–*

---

**3.** The *Martinez–Fuerte* majority opinion contains passages that could be construed to include the interdiction of smuggling contraband into this country as part of the interest balancing which supports its holding: "Routine checkpoint inquiries apprehend many *smugglers* and illegal aliens who succumb to the lure of such highways." *Id.,* 428 U.S. at 557, 96 S.Ct. at 3082 (emphasis added); "[S]uch a requirement would largely eliminate any deterrent to the conduct of well-disguised *smuggling* operations ..." *Id.* (emphasis added). But the exclusive concern of the rest of the opinion on the problem of illegal immigration suggests that, in these passages, the Court is referring to smugglers *of aliens.* That conclusion is corroborated by a similar passage in the opinion: "[The Border Patrol] operate[s] on a coordinated basis

designed to avoid circumvention *by smugglers* and others who transport the illegal aliens." *Id.,* at 552, 96 S.Ct. at 3080.

**4.** See *United States v. Watson,* 678 F.2d 765, 771 (9th Cir.1982), *cert. denied,* 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982):

We assume that the administrative plan which led to the boarding of the [vessel] was motivated partly by suspicion of drug smuggling. However, the stop and search had an independent administrative justification, and did not exceed in scope what was permissible under that administrative justification. Therefore, we need not consider any criminal enforcement interest the Coast Guard may have had.

*Fuerte* controls. No articulable suspicion was required. The convictions are accordingly AFFIRMED.